**In re Vontu W. SPRAGGINS and Tanganesha L. Spraggins, Debtors.**

No. 03–26987–SVK.

United States Bankruptcy Court, E.D. Wisconsin.

Oct. 8, 2004.

Michael J. Watton, Milwaukee, WI, for Debtors.

## MEMORANDUM DECISION ON DEBTORS' OBJECTION TO CLAIM

SUSAN V. KELLEY, Bankruptcy Judge.

The Chapter 13 Debtors objected to the claim of Get It Now LLC secured by a computer, television and VCR purchased by the Debtors from their local Get It Now store. The creditor filed its claim as fully secured in the amount of $4,205.86, but the Debtors believe that the value of the collateral securing the claim is only $1,700.00.

Under Bankruptcy Rule 3001(f), a creditor's proof of claim constitutes *prima facie* evidence of the validity and amount of the claim. This presumption places the burden of producing evidence to rebut the claim on the Debtors. If the Debtors present sufficient evidence to rebut the presumption, the burden then transfers to the creditor to assume the ultimate burden of persuasion on the issue of the value of the collateral securing its claim. *In re Roberts,* 210 B.R. 325, 328 (Bankr. N.D.Iowa 1997).

In this case, the valuation in the claim is based on the fact that the collateral was purchased on the eve of bankruptcy. The Debtors paid $1,389.95 for the computer on February 25, 2003 and $2,829.96 for the 60-inch high definition TV and VCR on April 22, 2003. The Debtors filed their bankruptcy petition on May 1, 2003, and the effective date of the confirmed plan was May 21, 2003. The effective date of the plan is the date as of which the valuation is made. *In re Jones,* 219 B.R. 506, 509 (Bankr.N.D.Ill.1998). The creditor's valuation is supported by *In re Coles,* 252 B.R. 66, 68 (Bankr.E.D.Va.1999), in which the bankruptcy court found that the price paid by the debtors two and one-half months prior to bankruptcy represented the value of the collateral for purposes of the chapter 13 plan.

According to the Debtors, the sale price of the goods is not a proper measure of value in this case, because the creditor's stores are located in low income neighborhoods, and the creditor caters to consumers with poor credit ratings. The Debtors contend that the creditor inflates the sale price of its merchandise to account for the risks inherent in this market. The Debtors would have the court remove this inflated profit margin from the value in light of a footnote in *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).[1]

In *Rash,* the Supreme Court held that "replacement value" is the appropriate valuation standard when a chapter 13 debtor proposes to "cram down" a plan on a secured creditor.[2] In footnote 6, the Court stated:

> Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning.

520 U.S. at 965 n. 6, 117 S.Ct. 1879 (citations omitted).

The footnote suggests that a retail seller's costs such as inventory storage should not be included in the "replacement value." As a result, at least one scholar has con-

---

1. The Debtors based their valuations on recent listings from E–Bay, although the Debtors admitted that they did not include the shipping costs in their valuation, which can be a significant addition to an E–Bay purchase.

2. "Cramdown" is the option under Bankruptcy Code § 1325(a)(5)(B) under which a debtor proposes to retain collateral in a chapter 13 case over the secured creditor's objection. To exercise the cramdown option, the debtor must provide the creditor with a payment stream with a present value as of the effective date of the plan, of the creditor's allowed secured claim.

cluded that wholesale value is the equivalent of replacement value under *Rash*. Jean Braucher, *Getting It for You Wholesale: Making Sense of Bankruptcy Valuation of Collateral after Rash*, 102 Dick. L.Rev. 763, 773 (Summer 1998). "Therefore, the inclusion of the example 'inventory storage' shows that the Court wants the bankruptcy courts to subtract from retail value the costs of retail selling—overhead, commissions, and any other costs." *Id.* at 774. Braucher reasons that once the court subtracts all of the elements that the debtor does not receive, including the retailer's profit, the end result is a wholesale value. *See also, In re Ruiz*, 227 B.R. 264, 267 (Bankr.W.D.Tex.1998) (questioning the exclusion of overhead from the retail value).

Another approach is typified by *In re McElroy*, 210 B.R. 833, 835 (Bankr.D.Or. 1997), which held:

> [V]aluation should be based on prices paid in the market that is accessible to debtors, which includes, without limitation, sales by dealers to the public, auctions open to the public and sales between private parties. That market is broader than the "retail" market. One must then deduct from the prices realized at such sales the value added by reconditioning, warranties, and the cost of other services or additions provided by the seller.

Other courts split the wholesale and retail values to arrive at the appropriate replacement value. In *First Merit N.A. v. Getz (In re Getz)* 242 B.R. 916, 919–920 (6th Cir. BAP 2000), the Bankruptcy Appellate Panel stated:

> Using the average of the N.A.D.A. wholesale and retail values as a starting point to determine the replacement value of a vehicle for a Chapter 13 cram down is consistent with the dictates of *Rash*, which recognized the discretion of the trial judge to adopt a rule for re-

placement valuation "to serve the interests of predictability and uniformity." *Rash*, 117 S.Ct. at 1886. Further, the bankruptcy court's approach of using the average of retail and wholesale values merely as the starting point subject to adjustment by other evidence introduced by the parties is not precluded by *Rash's* rejection of the Seventh Circuit's approach of mechanically assigning the midpoint between the collateral's foreclosure and replacement values. *Id.* The bankruptcy court's method of valuation did not include value for items not retained by the Debtor and also recognized that a debtor has access to markets other than the retail market. *See In re McElroy*, 210 B.R. 833, 835 (Bankr.D.Or.1997).

*Getz* and its progeny which have adopted the averaging approach must recognize that, in order to comply with *Rash*, the average is merely the starting point subject to adjustment by other evidence introduced by the parties. *In re Marquez*, 270 B.R. 761, 766 (Bankr.D.Ariz.2001).

The court in *In re Gonzalez*, 295 B.R. 584, 590 (Bankr.N.D.Ill.2003), interpreted *Rash* as rejecting all "starting points, benchmarks, polestars, shortcuts and rules of thumb." The *Gonzalez* court relied on appraisal testimony to determine the ultimate question: the replacement value that a willing buyer like the debtor would pay for property like that at issue. *Id.* at 591. However, requiring appraisals is not practical in this case, involving the valuation of a computer and television set. The Supreme Court recognized in *Rash* that a simple rule of valuation is needed in consumer cases, "to serve the interests of predictability and uniformity," and using starting points and guides for valuing used cars and household goods promotes efficiency and economy for debtors and credi-

tors alike. *Rash,* 520 U.S. at 965, 117 S.Ct. 1879.

While our approaches may be different, this court heartily agrees with *Gonzalez,* that, notwithstanding footnote 6, the critical inquiry is the price a buyer like the debtor would pay for property like the collateral. In this case the answer is easy because the Debtors purchased the collateral less than 65 days before bankruptcy. Presumably if they could have purchased the same items from E–Bay or another source for less, the Debtors would have done so.

With respect to the 60–inch television purchased within 10 days of the bankruptcy petition, the Debtors' intentions appear less than honorable. Regardless of the nature of the creditor and the alleged excessive profit included in its prices, there is something nefarious about purchasing a luxury item on credit on the eve of bankruptcy, and then proposing to repay the seller less than half the sale price over five years in a chapter 13 plan. Nothing in the Bankruptcy Code suggests that Chapter 13 was intended to be used for this purpose, and this court simply cannot justify the extension of *Rash's* footnote to permit such an onerous treatment of the Creditor's claim.

Cars are rarely luxury goods for chapter 13 debtors, and no ulterior motive would normally be ascribed to a debtor who purchased a car shortly before filing bankruptcy and then sought to take advantage of the cram down provisions. Yet at least two bankruptcy courts have utilized the vehicle's sale price as its "replacement value" in these circumstances. The court in *In re Coles,* 252 B.R. at 68, determined that the purchase price of a car bought within two and one-half months of the filing of the petition presumptively established the replacement value under *Rash.* And, in *In re Ruiz,* 227 B.R. at 267, the retail value of a truck purchased four months before bankruptcy was chosen as the replacement value, even though the "blue book" value was $5,000 less. The court questioned how a vehicle could depreciate $5,000 in four months, and noted that the debtors did not produce any evidence that they could replace the vehicle for the lower amount.

This court adopts the reasoning of *Coles* and *Ruiz,* and holds that the replacement value of any household consumer goods such as televisions, stereos and computers, purchased within 90 days of the bankruptcy petition, shall be the purchase price paid by the debtor. With respect to vehicles, an eve-of-bankruptcy purchase price would presumptively constitute the replacement value, subject to the production of evidence by the debtor that the debtor has access to a market to replace the vehicle for less than the purchase price.

In accordance with this Memorandum Decision, an Order will be entered overruling the Debtors' Objection to the Claim.